Daniel Feinberg (SBN No. 135983)
Nina Wasow (SBN No. 242047)
FEINBERG, JACKSON,
WORTHMAN & WASOW LLP
2030 Addison Street, Suite 500
Berkeley, CA 94704
Telephone: (510) 269-7998
Fax: (510) 269-7994
dan@feinbergjackson.com
nina@feinbergjackson.com

Mark Thomson (*pro hac vice* to be filed)
ENGSTROM LEE LLC
323 N. Washington Ave, Suite 200
Minneapolis, MN 55401
Telephone: (612) 305-8349
mthomson@engstromlee.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER DAWSON-ROBERTS, as representative of a class of similarly situated persons, and on behalf of the Norman S. Wright Mechanical Equipment Corporation Employee Stock Ownership Plan,<br><br>Plaintiff,<br><br>v.<br><br>NORMAN S. WRIGHT MECHANICAL EQUIPMENT LLC, THE NORMAN S. WRIGHT MECHANICAL EQUIPMENT CORPORATION EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE, RICHARD F. LEAO, ROBERT L. BEYER, and SALVATORE M. GIGLIO,<br><br>Defendant. | Case No. 3:26-cv-01171<br><br>**CLASS ACTION COMPLAINT**<br><br>Violations of Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* |

CLASS ACTION COMPLAINT

1

**NATURE OF THE ACTION**

2    1.    Plaintiff Christopher Dawson-Roberts, as the representative of the Class described

3    herein, and on behalf of the Norman S. Wright Mechanical Equipment Corporation Employee

4    Stock Ownership Plan (the "ESOP" or "Plan"), brings this action pursuant to the Employee

5    Retirement Income Security Act, as amended, 29 U.S.C. § 1001 et seq. ("ERISA"), against

6    Norman S. Wright Mechanical Equipment LLC ("Norman S. Wright" or the "Company"), the

7    Norman S. Wright Mechanical Equipment Corporation Employee Stock Ownership Plan

8    Committee (the "Committee"), Richard F. Leao, Robert L. Beyer, and Salvatore M. Giglio

9    (collectively, "Defendants"). This case is about Defendants' failure to invest the non-employer

10    stock assets of the ESOP prudently and for the exclusive benefit of ESOP participants. The

11    foregoing violated Defendants' fiduciary duties under ERISA, 29 U.S.C. §§ 1104(a)(1) and

12    1106(a).

13

**PARTIES**

14    2.    The ESOP is an "employee pension benefit plan" within the meaning of 29 U.S.C.

15    § 1002(2)(A); a "defined contribution plan" as defined by 29 U.S.C. § 1002(34) (also known as

16    an "individual account plan"); and an "employee stock ownership plan" as defined by 29 U.S.C. §

17    1007(d)(6). The ESOP is sponsored by Norman S. Wright for the benefit of its employees.

18    3.    Plaintiff Christopher Dawson-Roberts is a natural person and a resident of Auburn,

19    California, who worked for the Company from 2015 until 2022 as the Customer Service

20    Manager, Parts Division. He is a participant in the ESOP. Plaintiff's ESOP account would be

21    worth more today if not for Defendants' fiduciary mismanagement. His future ESOP account

22    growth will be impaired if Defendants are not enjoined from further mismanagement.

23    4.    The Committee is the ESOP's governing committee established by the written

24    terms of the ESOP. The Summary Plan Description (SPD) states that "under the terms of your

25    plan, the Plan Committee has the responsibility for the investment and control of the Plan's

26    assets." Accordingly, the Committee is a fiduciary of the ESOP pursuant to 29 U.S.C. §

27    1002(21)(A).

28

2                                      CLASS ACTION COMPLAINT

5.      The Committee is comprised of members of the company's Board of Directors (the "Board"). The SPD provides that the Board appoints the members of the Committee. Therefore, the Board was responsible for monitoring the Committee and exercised practical control over the ESOP's investments throughout the relevant period.

6.      Defendant Richard F. Leao is a natural person and resident of California. At all relevant times, Defendant Leao was President and CEO of Norman S. Wright and a member of the Board. Defendant Leao served as a member of the Committee and as Trustee of the ESOP throughout the relevant period. The SPD states that the Trustee(s) of the Plan is appointed by the Board. The SPD further provides that the Trustee is a directed trustee who receives directions from the Committee regarding the control and management of Plan assets. As a Committee member, Defendant Leao was responsible for holding and investing Plan assets and for directing the investment of ESOP assets. Defendant Leao or a trust controlled by Leao is a 10 percent or more shareholder in Norman S. Wright. As a Committee member and Trustee, Defendant Leao is a fiduciary of the ESOP pursuant to 29 U.S.C. § 1002(21)(A) and 29 U.S.C. § 1102(a)(2).

7.      Defendant Robert L. Beyer is a natural person and resident of Utah. At some or all relevant times, Defendant Beyer was Vice President of Norman S. Wright and a member of the Board. Defendant Beyer served as a member of the Committee during some or all the relevant period. As a Committee member, Defendant Beyer was responsible for holding and investing Plan assets and for directing the investment of ESOP assets. Defendant Beyer or a trust controlled by Beyer is or was a 10 percent or more shareholder in Norman S. Wright. As a Committee member, Defendant Beyer is or was a fiduciary of the ESOP pursuant to 29 U.S.C. § 1002(21)(A) and 29 U.S.C. § 1102(a)(2).

8.      Defendant Salvatore M. Giglio is a natural person and resident of California. At all relevant times, Defendant Giglio was Treasurer, Executive Vice President and/or Chief Operating Officer of Norman S. Wright and a member of the Board. Defendant Giglio served as a member of the Committee throughout the relevant period. As a Committee member, Defendant Beyer was responsible for holding and investing Plan assets and for directing the investment of ESOP assets. Defendant Giglio or a trust controlled by Giglio is a 10 percent or more shareholder in Norman S.

CLASS ACTION COMPLAINT

Wright. As a Committee member, Defendant Giglio is a fiduciary of the ESOP pursuant to 29 U.S.C. § 1002(21)(A)(i) and 29 U.S.C. § 1102(a)(2).

9.      Defendants Committee and its individual members – Defendants Leao, Beyer and Giglio – are referred to herein as the "Committee Defendants."

10.     Defendant Norman S. Wright is a limited liability company and the successor to Norman S. Wright Mechanical Corporation. Norman S. Wright Mechanical Corporation converted to a limited liability company on or about September 26, 2024. Prior to the conversion, Norman S. Wright Mechanical Corporation was an S Corporation. As used herein, "Norman S. Wright" refers to both the limited liability company and its predecessor(s).

11.     Defendant Norman S. Wright is the sponsor of the Plan and named as the Plan Administrator in the SPD. Therefore, Norman S. Wright is a "named fiduciary" pursuant to 29 U.S.C. § 1102(a)(2). The SPD further provides that Norman S. Wright may delegate its duties as Plan Administrator to the Committee. Acting through its Board of Directors, Norman S. Wright appoints and has the power to remove members of the Committee and the Trustee and has a fiduciary duty to monitor their performance. As a result of its authority to appoint and remove fiduciaries of the ESOP, Norman S. Wright is itself a fiduciary pursuant to 29 U.S.C. § 1002(21)(A)(i), (iii).

## JURISDICTION AND VENUE

12.     Plaintiff brings this action pursuant to 29 U.S.C. §§ 1132(a)(2) and (3), which provide that a participant in an employee benefit plan may pursue a civil action on behalf of the plan to remedy violations of ERISA and obtain monetary and appropriate equitable relief.

13.     This case presents a federal question under ERISA and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

14.     Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because the ESOP is administered in Brisbane, California, at least some of Defendants' violations of ERISA occurred in Brisbane, California, and Norman S. Wright is located in Brisbane, California.

CLASS ACTION COMPLAINT

15.     For purposes of intra-district assignment, this action arises in San Mateo County in that some of the alleged breaches took place in San Mateo County and one or more of the Defendants may be found in San Mateo County.

## DEFENDANTS' ACTIONS AND OMISSIONS WITH RESPECT TO THE ESOP'S OTHER INVESTMENTS ACCOUNT

16.     Norman S. Wright is a distributor of HVAC product lines for the commercial and industrial markets and provides HVAC system design and maintenance.

17.     Norman S. Wright established the ESOP in 2018 to provide retirement benefits to employees. The ESOP has averaged approximately 350-400 participants with account balances during the subject period. Participants do not control the Plan's investments and instead rely on Defendant Committee and its members to make investment decisions for the Plan.

18.     Norman S. Wright is a closely held private company. Norman S. Wright stock is not traded on any public market.

19.     The ESOP has two types of assets: Norman S. Wright stock and other investments. The other investments are known as the "Other Investments Account" ("OIA") per the ESOP's SPD. The SPD states that "Any cash assets in the [ESOP] Trust which are not invested in Company stock may be used to purchase other investments."

20.     Each participant's account value is equal to their pro rata share of the ESOP's total asset value. Each participant's benefit amount is equal to their account value at the time that it is distributed.

21.     Participants are credited with a share of company contributions, Company profit distributions, and shares of Norman S. Wright stock while employed by the Company. Participant credits are then adjusted over time—until distribution of their account—by investment gains, losses, and income on the ESOP's company stock and OIA investments.

22.     The ESOP has a six-year graded vesting schedule under which participants are 20% vested after two years of credited service and do not become 100% vested in their ESOP benefits until they have six years of credited service.

5                          CLASS ACTION COMPLAINT

23.    For participants who terminate service from the Company for reasons other than death, disability or attaining the normal retirement age of 65 and who have an individual account exceeding $5,000, the participant does not begin receiving distribution of their account until the sixth Plan Year following the Plan Year in which the participant separated from service. (The "Plan Year" is the same as the calendar year.) For such participants, distribution of their ESOP accounts will be made in substantially equal annual installments over a period of five years. For example, a vested participant under age 65 with an individual account exceeding $5,000 who left the Company for reasons other than death or disability in 2022 would not begin to receive distribution of their ESOP benefits until 2028. This hypothetical participant would not receive full distribution of their ESOP benefits until 2032 – ten years after terminating employment with the Company.

24.    On February 2, 2021, the Plan entered into an agreement with a stockholder of the Company for the purchase of 32,630 shares of Company common stock representing a 12% equity interest in Norman S. Wright for $12,096,690 ("2021 ESOP Transaction"). Upon information and belief, the selling stockholder was Defendant Beyer or a trust controlled by Beyer. The Plan paid the seller $6,046,845 using cash and entered into a note payable to the seller for the balance of $6,046,845. The seller note had an interest rate of 6% and was payable in six consecutive annual payments of $1,007,808 on the first day of each year beginning on January 1, 2022 and ending on January 1, 2027.  The Plan was permitted to prepay amounts due on the note at any time without penalty.

25.    The ESOP has not purchased any additional Company stock since the 2021 transaction. Upon information and belief, the Company's other shareholders have not offered to sell any additional shares to the ESOP since the 2021 transaction.

26.    Prior to the 2021 ESOP Transaction, Norman S. Wright contributed cash to the ESOP which was used to help fund the 2021 stock purchase:

- 2018: $5,000,000
- 2019: $2,000,000
- 2020: $3,000,000

CLASS ACTION COMPLAINT

27.     The ESOP also received an additional company cash contribution of $1,000,000 for the 2021 plan year, after the 2021 ESOP Transaction.

28.     Following the 2021 ESOP Transaction, the Plan received profit distributions from the Company. For 2021 – 2023, the Plan received profit distributions representing 12% of Company earnings. According to the ESOP's Form 5500 annual reports, the ESOP received profit distributions through 2024 in the following amounts:

- 2021: $3,018,480
- 2022: $4,512,000
- 2023: $4,321,975
- 2024: $2,059,807

29.     The ESOP has accumulated a substantial and growing OIA balance. According to the ESOP's Form 5500 annual reports, the OIA balance has grown dramatically following the ESOP's purchase of Company stock:

- 2021: $4,093,827
- 2022: $5,673,407
- 2023: $9,748,767
- 2024: $11,897,483

30.     The Plan made a prepayment on the note to the seller on November 2, 2021 in the amount of $3,000,000. On September 30, 2022, the ESOP paid balance of the note, plus accrued interest, to the seller. Thus, the ESOP paid off the note from the 2021 ESOP Transaction in approximately 20 months even though the note was scheduled to be paid off over six years.

31.     After the ESOP paid the balance of the seller note on September 30, 2022, the ESOP had no further need for cash to make loan payments.

32.     After the Plan finished paying off the note from the 2021 ESOP Transaction, the Plan continued to accumulate huge OIA cash balances rather than investing those assets prudently. As shown above, the ESOP's cash holdings increased over $6.2 million in cash holdings in just two years after all debt obligations were satisfied, with no prudent investment of these retirement assets.

33.    At all times, Committee Defendants have kept the OIA invested exclusively in assets on the lowest end of the risk-return spectrum. According to the Plan's Form 5500 annual reports, between 2021 and 2023, Committee Defendants left the entire OIA balance in cash equivalents that earned little or no interest, generating income less than $400 each year on millions of dollars in assets. Every time the ESOP received a profit distribution from the Company, the Committee Defendants invested the money in a deposit account that in a cash equivalent deposit account. In 2024, Committee Defendants transferred the Plan's OIA assets to other highly conservative cash equivalent accounts that yielded modestly higher returns.

34.    While the temporary accumulation of cash for the 2021 transaction and debt service may have been reasonable, the persistent and growing concentration of OIA funds in cash—particularly after all debt was retired—demonstrates a failure to prudently manage these retirement assets.

35.    The OIA balance is allocated to participant accounts. Participants have no control over how the OIA is invested. Participants rely on Defendants to prudently invest the OIA funds for the purpose of increasing the value of participants' individual accounts.

36.    Committee Defendants were responsible for setting the investment policy for the OIA, monitoring the performance of its investments, and determining whether to add, maintain, or remove OIA investments.

37.    Committee Defendants kept the OIA funds invested almost exclusively in bank deposit and money market accounts during all or most of the subject period. Returns on these investments were negligible compared to the returns of a prudently invested portfolio.

38.    Committee Defendants kept the OIA funds invested in short-term assets regarded by investment professionals to expose investors to substantial risk of loss of real buying power due to inflation if held over long periods.

39.    The Committee Defendants' investment of the OIA funds is unusual and imprudent. Cash equivalents such as bank deposit and money market accounts are appropriate only if the investor has a short-term investment objective, needs to preserve their principal

CLASS ACTION COMPLAINT

balance, and cannot tolerate market risk. Investing OIA assets exclusively in cash was not appropriate given the circumstances of this Plan.

40.    Bank and money market accounts are not designed or expected to provide competitive long-term capital appreciation needed by Plaintiff and the Class.

41.    A prudent fiduciary would have been aware of these facts. The risk and return characteristics of major asset classes are well-established, and prudent review of fiduciary investment guidance would have alerted the Committee Defendants to the risks of leaving OIA funds solely in cash.

42.    Investigating market index performance over relevant time periods likewise would have informed Committee Defendants that their strategy was flawed. In the 10 years prior to the 2021 ESOP Transaction, the ICE BofA 3-month Treasury Bill index—a common index used to represent the performance of cash equivalent investment products—averaged returns of 0.64% per year. Inflation averaged 1.73% per year during the same period, while the Dow Jones US Total Stock Market Index averaged 13.74% per year. Accordingly, the Committee Defendants should have known by monitoring recent market data that pursuing an all-cash strategy for OIA funds that started to accumulate in the Plan after the 2021 ESOP Transaction was likely to result in a loss of real buying power for ESOP participants, whereas investing in stocks offered substantial opportunity for capital appreciation.

43.    Monitoring recent market data also would have shown the Committee Defendants that cash equivalents earn significantly less over the long term, even when valued during declines in other asset classes. For example, after stocks dropped 20% in 2022, the 10-year average annual return for stocks stood at 12.03%, while the 10-year average for cash equivalents was 0.76%. Inflation over the same period averaged 2.46% per year.

44.    Investments in publicly traded stocks or stock funds were available to Committee Defendants throughout the subject period. Defendants could have invested OIA funds to include broad stock market exposure by adding a passively managed fund that tracks a stock index commonly used in retirement portfolios or an actively managed fund.

CLASS ACTION COMPLAINT

45.     Committee Defendants did none of these things and failed to consider public equities or implement a prudent investment strategy for the OIA.

46.     Committee Defendants' lack of diligence and care concerning the OIA is further evidenced by the fact that they did not bother to even obtain market interest rates for cash investments until 2024. Even after the ESOP paid its loan in full in September 2022, Committee Defendants kept the entire OIA in a deposit account that earned the ESOP $334 in interest in 2022 and only $82 in interest in 2023, according to the ESOP's Form 5500 annual reports. Money market rates in 2022 and 2023 would have earned the ESOP far more, and Committee Defendants were negligent by delaying their move to a cash product that paid market rates.

47.     The cost of Committee Defendants' mismanagement has been substantial. If Defendants had invested the OIA in a balanced portfolio that included stocks or an index fund tracking the S&P 500 between February 2021 and January 2026, the Plan would have earned millions of dollars more than the minimal returns achieved from cash holdings.

48.     The long-term loss for ESOP participants as a result of Committee Defendants' mismanagement will be severe if it is allowed to persist. The difference between cash and the returns of prudent investments compounds dramatically over time.

49.     Committee Defendants cannot excuse their investment of all OIA funds in cash by characterizing the ESOP's risk tolerance as low, or the time horizon for OIA investments as short-term. Neither is true.

50.     First, employee stock plans such as the ESOP invest primarily or exclusively in a single company's stock, which means that they have an aggressive risk tolerance. The ESOP's purpose is to provide a retirement benefit that will grow over time, not to preserve the value of the principal amount invested. This is confirmed by the SPD and the Plan's Form 5500 filings, which state that the Plan's primary purpose is to provide participants with an opportunity to accumulate capital for their retirement needs.

51.     Second, ESOP participants generally must reach retirement age or be separated from Norman S. Wright for ten years before they can receive their full account balance. Accordingly, participants are invested in the ESOP for the long term in fact, not just in theory.

CLASS ACTION COMPLAINT

52.     Third, long-term capital appreciation is the default objective of retirement investments. The Department of Labor, which oversees employee retirement plans, has instructed that "investments made on behalf of . . . participants ought to and often will be long-term investments," warning that overallocation to cash strategies will "decrease the likelihood that participants . . . have adequate retirement savings."

53.     Committee Defendants' failure to invest the OIA in a manner that is consistent with the ESOP's long-term investment objective is not excused by the fact that the ESOP borrowed money to fund a portion of the 2021 ESOP Transaction.

54.     Even after the February 2021 stock purchase, substantial OIA balances remained invested in cash. Moreover, the Plan made aggressive prepayments on the note, paying it off completely by September 30, 2022, yet continued to accumulate massive cash balances rather than investing them prudently.

55.     The allocation of substantially all OIA assets to cash during the class period was not the result of any decision that this investment was in the best interests of the ESOP and its participants. Rather, it was primarily the product of neglect and a failure to manage these assets consistent with ERISA's fiduciary standards.

56.     The Company, as the appointing fiduciary, had a duty to monitor the performance of the Committee Defendants, and remove individual Committee members who were not prudently investing the Plan's OIA assets.

**A.  The Prudent Investor Rule**

57.     Under ERISA, fiduciaries must follow the "prudent investor rule" adopted from the law of trusts. *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) ("In fulfilling his duties, a trustee is held to 'the prudent investor rule,' which requires that he "invest and manage trust assets as a prudent investor would").

58.     Pursuant to the prudent investor rule, fiduciaries must invest plan assets in a manner that is "reasonably designed to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain." 29 C.F.R. § 2550.404a-1(b)(2)(i); see also Restatement (Third) of Trusts (2007) (hereinafter "3d Rest.") § 90(a) (fiduciaries must pursue an "an

CLASS ACTION COMPLAINT

1    overall investment strategy[] which ... incorporate[s] risk and return objectives reasonably

2    suitable to the trust.").

3        59.    The prudent investor rule departs from earlier understandings of prudence that

4    overemphasized risk avoidance. *See* 3d Rest. § 90 cmts. a & k.

5        60.    Rather than avoid risk, fiduciaries must manage risk in pursuit of the objectives of

6    the plan. *See* Max M. Schanzenbach, *et al*. "The Prudent Investor Rule and Market Risk: An

7    Empirical Analysis." Journal of Empirical Legal Studies Volume 14, Issue 1, 129:168, 130

8    (March 2017) ("The prudent investor rule … reorients trust investment from risk avoidance to

9    risk management[.]").[1]

10        61.    An appropriate investment strategy suited to the objectives of the plan must

11    consider the time horizons and needs of beneficial investors. *See* 29 C.F.R. § 2550.404a-1(b)(4)

12    ("A fiduciary's determination with respect to an investment" must "us[e] appropriate investment

13    horizons consistent with the plan's investment objectives."); *see also* 3d Rest. § 90 cmt. k ("Asset

14    selection ... requires sensitivity to the trust's investment time horizons"). A plan's risk tolerance

15    "largely depends" on how long funds will be held. *Id.* cmt. c(1).

16        62.    In order to maintain investments that are suited to participants' investment

17    objectives and risk tolerances, a prudent fiduciary must understand the risk and return

18    characteristics of different asset classes.

19        63.    Stocks generate the highest long-term average returns, although they exhibit the

20    highest short-term volatility. *See* 3d Rest. § 90 cmt. l ("[Historically, corporate stocks have

21    provided greater total return over the long term than bonds but ordinarily entail higher risks[.]").

22        64.    Cash equivalents generate the lowest long-term average returns, but they reduce

23    volatility risk to close to zero. *See id.* ("Returns from these investments have traditionally been

24    relatively low, but their convenience, liquidity, and safety ... are especially useful in making

25    modest amounts of trust funds productive for limited periods of time.").

26

27

28    
---

[1] Available at www.aals.org/wp-content/uploads/2018/02/AM17PrudentInvestorRuleandMarketRisk.pdf.

CLASS ACTION COMPLAINT

65.     Other assets typically fall in the middle, with the general rule being that bonds of longer duration or lower credit quality will produce higher long-term returns (albeit with higher risk) than bonds of shorter duration or higher credit quality. *See id.*

66.     A prudent fiduciary would have understood these characteristics, which have held true for more than a century. A recent study found that for 140 years, over any given 10-year period, more volatile investments in stocks consistently compensated long-term investors with higher returns and increased buying power, after adjusting for inflation.[2] *See* Oscar Jorda *et al.*, *The Rate of Return on Everything, 1870-2015*, 134 Q.J. ECON. 1225, 1241–45, 1284–85 (2019).

67.     Conversely, assets invested in cash, despite nominally protecting the principal amount, are subject to the risk of loss of real buying power if cash returns do not keep pace with inflation. *Id.* at 1277 (reporting that "negative real rates [on cash] have been relatively common in modern financial history."). The prudent investor rule specifically warns of the risk of loss of buying power and the future income caused by investing solely in assets, such as bank deposit accounts, that do not provide capital growth:

> [T]he trustee should recognize that in prominently pursuing a high-yield and low-growth (or non-growth) investment strategy, adhered to over a long period, would pose a risk not only to principal interests but also with respect to … future security; the effects of such a strategy would be comparable to a regular practice of invading principal.

3d Rest. § 90 cmt. c.

68.     Whether a fiduciary has satisfied its duty is a test of conduct and process. *Id.* cmt. (c)(1).

**B. Prudent Investment of Plan Money**

69.     A prudent fiduciary considering the risk tolerances, time horizons, and needs of Plan participants and the objectives of the Plan would have determined that the Plan needed to pursue an investment policy that seeks capital appreciation. Pursuing a capital appreciation

[2] The one exception appears to have been looking back 10 years from the middle of the Great Depression. *See id.* at 1285. Every other rolling 10-year period over 140 years saw a payoff for growth-oriented investments in stock and real estate. *See id.*

CLASS ACTION COMPLAINT

strategy required Committee Defendants to reinvest the Plan's OIA assets derived from Norman S. Wright profit distributions or Company contributions in a diversified pool of publicly traded stocks or a balanced portfolio that combines stocks with other asset classes that offer the potential for higher income and gains over the long term.

70.     First, employees generally have a long investment time horizon. *See* 72 Fed. Reg. 60452, 60463 (finding that retirement investments made on behalf of employees "ought to and often will be long-term investments"). The tax code and the terms of the Plan encourage or require Plan participants to keep their account balances in the Plan for the long term. Employees may accumulate investment earnings tax free so long as they leave their accounts in the Plan. Conversely, employees are assessed a 10% IRS penalty in most circumstances if they spend their account balances prior to reaching age 59 ½. Moreover, the option to suffer an early withdrawal penalty arises only if the participant is eligible for a distribution under the terms of the Plan, which for most participants who remain employed with Norman S. Wright will not occur until they reach age 65.

71.     Accordingly, employees can generally tolerate short-term risk associated with stock market volatility. The more salient risk to participants is the loss of real buying power over the duration of their investment time horizon due to inflation. To tailor the Plan's investment policy to participants' risk tolerances and sensitivities, a prudent fiduciary would have obtained stock market exposure for participants from their unused cash dividends, as investing in stocks is a recognized prudent investment strategy to manage inflation risk. *See* 3d Rest. § 90 cmt. 1 ("a primary and proper attraction of common stocks is that they offer trustees a hedge against loss of purchasing power").

72.     Second, employees need the profit distributions allocated to their accounts to continue to grow to increase their future income streams in retirement. The objective of retirement plans is to provide retirement income. *See* 87 Fed. Reg. 73822, at 73825 (Dec. 1, 2022) (emphasizing "the interests of the participants and beneficiaries in their retirement income" as the principal concern of ERISA fiduciaries). As of 2024, the average value of participants' accounts in the ESOP was less than $150,000 – far less than the savings necessary for a comfortable

retirement. The need to increase participants' buying power in retirement also calls for stock market exposure. *See* 3d Rest. § 90 cmt. l (investing in stocks is appropriate when a "deliberate effort to increase the real value of the trust estate" is needed).

73.    Third, investing in other stocks is a recognized prudent investment strategy for managing the specific risks that the Plan faces due to its high investment concentration in the stock of a single company. *See* 3d Rest. § 90 cmts. c(1), g, & gen. note to cmts. c–h (describing "specific" or "nonmarket" risk as the risk associated with a single security). Specific risk is reduced by broadening the number and character of securities held in the same class—in this case, stocks. *See id.* cmt g ("[R]sk … is always greater with a single stock than it is with multiple stocks.").[3]

74.    Fourth, the purpose of the Plan is to provide equity returns to participants through partial ownership of the company. Accordingly, when the Plan receives profit distributions that cannot be reinvested in Norman S. Wright stock due to the lack of additional Norman S. Wright shares for purchase, a prudent fiduciary would seek replacement equity returns through reinvestment in other stocks.

75.    Fifth, a prudent fiduciary would seek market liquidity and low costs by investing in publicly traded stocks through pooled investment funds such as mutual funds. The potential cost and administrative complexity of pursuing a capital appreciation strategy is greatly reduced by using pooled funds that hold public securities, making growth strategies practicable for even relatively small plans that need to be able to invest and settle participant accounts without incurring significant costs or other restrictions. *See* 3d Rest. cmts. h, l.

76.    Sixth, the fact that some participants will retire or otherwise become eligible for distributions from the Plan each year does not change the conclusion that a prudent fiduciary would have sought capital appreciation from unused profit distributions because the profit distributions received by the Plan each year greatly exceeded the Plan's benefit distributions or

---

[3] An ESOP's investment in company stock is exempt from ERISA's duty to diversify. See 29 U.S.C. § 1104(a)(2). This means that an ESOP need not sell off company stock in order to become more diversified. However, if an ESOP accumulates substantial assets other than company stock, as the Plan has done, prudent risk management principles apply to those other assets, and the fiduciary must give appropriate consideration to the portfolio as a whole and the objectives of the plan. *See* 29 C.F.R. § 2550.404a–1(b).

CLASS ACTION COMPLAINT

projected annual profit distributions. To the extent that participants approaching retirement wish to reduce their volatility risk, the Plan has a built-in mechanism for them to customize their investment strategies. Participants who reach age 55 and have 10 years with the company may elect to diversify a portion of their account.

77.    Market returns over the last 3-, 5- and 10-years confirm that Plan participants do not benefit from short-term volatility protection while their dividends sit in deposit accounts for years. Rather, participants lose real buying power due to inflation, and substantial opportunity for gains, due to the lack of reinvestment in stocks. Had the Committee Defendants researched and monitored market returns over the last 3-, 5- and 10-years, they would have discovered that the Plan needed to reinvest Norman S. Wright profit distributions in other stocks to serve the needs of participants.

**Illustration A: 3-Year Annual Averages[4]**

|  | 2021 (2019-2021) | 2022[5] (2020-2022) | 2023 (2021-2023) | 2024 (2022-2024) |
|---|---|---|---|---|
| Stocks | 25.72% | 6.89% | 8.43% | 7.88% |
| Inflation | 2.57% | 4.61% | 5.59% | 4.98% |
| Cash | 0.99% | 0.72% | 2.15% | 3.88% |

**Illustration B: 5-Year Annual Averages**

|  | 2021 (2017-2021) | 2022 (2018-2022) | 2023 (2019-2023) | 2024 (2020-2024) |
|---|---|---|---|---|
| Stocks | 17.92% | 8.65% | 15.05% | 13.77% |
| Inflation | 2.46% | 3.61% | 3.94% | 4.17% |
| Cash | 1.14% | 1.26% | 1.88% | 2.45% |

**Illustration C: 10-Year Annual Averages**

[4] Stock market and cash returns are represented by the following broad-based securities indexes: Stocks – Dow Jones US Total Stock Market: Cash – 3-Month Treasury Bill. Inflation rates are per the Federal Reserve Bank: https://fred.stlouisfed.org/series/FPCPITOTLZGUSA.
[5] The year 2022 is notable because stocks were down 20% on the year, but the stock market's 3-, 5- and 10-year averages remained substantially higher than both cash earnings and the rate of inflation

|  | 2021 (2012-2021) | 2022 (2013-2022) | 2023 (2014-2023) | 2024 (2015-2024) |
|---|---|---|---|---|
| Stocks | 16.24% | 12.03% | 11.40% | 12.47% |
| Inflation | 1.89% | 2.46% | 2.73% | 2.86% |
| Cash | 0.63% | 0.76% | 1.25% | 1.76% |

78.     Pooled investment funds with established track records that offer broad exposure to the stock market, or a mix of stocks and other assets, and daily liquidity were readily available to the Committee Defendants to invest in on behalf of the Plan at minimal cost during the relevant time, had the Committee Defendants engaged in a prudent process. Neither special skill with respect to manager selection, nor keen insight with regard to management style, was needed in order for the Plan to obtain superior returns from the Plan's profit distributions. Dozens of mutual funds sold by numerous firms employing an array of investment styles generated average annual returns, net of fees, that significantly outpaced cash equivalents and inflation by investing in a prudent mix of publicly traded stocks and other assets during the relevant time.

## C. Share Recycling

79.     Committee Defendants' practice of leaving excess profit distributions in cash accounts is not excused by the Plan's possible repurchase and reallocation of shares when participants leave the Plan. Distributing departing participants' share values in cash from an ESOP and then reallocating their shares to current participants is called "recycling."

80.     Plaintiff lacks information regarding whether Committee Defendants, in fact, considered possible share recycling in relation to their management of the Plan's profit distributions. Plaintiff does not allege or infer that Committee Defendants engaged in such a process. Any claim by Committee Defendants that they did consider possible share recycling in connection with their investment decisions would need to be made affirmatively by Defendants and be subject to discovery.

CLASS ACTION COMPLAINT

81.     If Committee Defendants do assert that their profit distribution investment decisions were guided by concern for possible share recycling, Committee Defendants managed those decisions imprudently in breach of their fiduciary duties under 29 U.S.C § 1104(a)(1).

82.     An ESOP's assets do not need to be held in cash accounts in order to be available for share recycling. Had the Committee Defendants reinvested Norman S. Wright profit distributions in stock mutual funds that provide daily liquidity, any amount of the Plan's mutual fund balance would have been available to convert to cash on demand to fund recycling transactions.

83.     If Committee Defendants left the Plan's dividends in cash accounts because they believed that only cash accounts provided daily liquidity, that belief was incorrect and imprudent and violated ERISA's standard of care.

84.     If Committee Defendants knew that stock mutual funds provided daily liquidity but were concerned that stock mutual fund holdings would lose value before the anticipated recycling transactions, that is a time horizon question. The Committee Defendants needed to consider whether and when the Plan's non-Norman S. Wright stock assets might be used to recycle shares and the risks associated with the investment strategies available in the interim, given the time horizon.

85.     For example, if the Committee Defendants held a sum of cash dividends certain to be used to recycle shares in 3 months, the volatility risk associated with reinvesting the dividends in stock mutual funds in the interim (*i.e.*, the risk that dividends reinvested in stock mutual funds would be exchanged for less than current value in 3 months due to stock market volatility) would call for a capital preservation strategy.

86.     Alternatively, if the Committee Defendants did not expect to use a sum of cash dividends for 3 years or longer, the Plan could tolerate monthly volatility associated with reinvesting in stock mutual funds, but the Plan would face near certain loss of opportunity for capital appreciation, and loss of real buying power, if that sum remained in cash. *See supra, Illus. A–C*. This outlook, of which a prudent fiduciary monitoring asset performance and inflation would have been aware, would call for a capital appreciation investment strategy. *See id.*

CLASS ACTION COMPLAINT

87.    In ESOPs such as the Plan that hold private company stock, a plan fiduciary must utilize a competent repurchase study or similar analysis to give appropriate consideration to the time horizon and risks that apply to the reinvestment of other ESOP assets. A repurchase study is typically prepared by a professional advisor to help the sponsor company and the ESOP develop a financial plan for funding cash payments to participants as they become eligible to liquidate their shares of company stock. The repurchase analysis bears substantially on the investment time horizon for non-employer stock assets that the ESOP holds or may accumulate over time.

88.    A repurchase study estimates the amounts needed to repurchase participant shares as they exit the ESOP. The repurchase study looks at the withdrawal terms of the plan; participant ages, stock holdings, and employment statutes; the projected price of company stock, and other factors to estimate the cost of participant share liquidations that will occur each year in the future.

89.    The repurchase study also estimates future income available to fund participant share repurchases. This analysis includes projected company earnings, the history of contributions and dividends paid to the ESOP, and projected investment earnings.

90.    Estimates regarding future repurchases and income allow the sponsor company and the ESOP to develop a financial plan to fund repurchases. There are multiple options concerning how to fund repurchases, including whether the cash used in repurchase transactions will be sourced from the company or the ESOP.

91.    The company that sponsors the ESOP—and not the ESOP itself—is legally obligated to plan participants to repurchase their shares when they become eligible to receive a distribution of their account. *See* 26 U.S.C. § 409(h)(1)(B); 29 C.F.R. § 2550.408b-3(j). If a company satisfies its repurchase obligation directly, the company supplies the cash for the transaction, and the company may then reissue or resell the repurchased shares to the ESOP or another party, cancel them, or hold them in reserve.

92.    Alternatively, the ESOP may repurchase shares from eligible participants. The cash for the transaction is drawn from other ESOP participants' accounts, and the ESOP reallocates the repurchased shares to the participants whose accounts provided the cash.

CLASS ACTION COMPLAINT

Recycling transactions are voluntary for the ESOP. Whether to use ESOP assets to complete recycling transactions is a fiduciary act that must be taken only if it is interest of participants.

93. Given that the company or the ESOP may fund repurchases, business and fiduciary decisions are necessarily intertwined. If the company does not repurchase shares directly, that creates a repurchase opportunity for the ESOP. But if the ESOP declines or fails to repurchase the shares, the company becomes liable to complete the transaction.

94. Because it is often in the interest of ESOP participants to have the ESOP reallocate departing participants' shares, yet it exposes the company to risk if the ESOP declines or fails to complete the repurchases, it is typical for ESOP sponsors to set aside at least enough company earnings to fund the expected repurchases each year, while also providing the ESOP the opportunity to use those funds to make the repurchases if desired. The funds are transferred to the ESOP as contributions, profit distributions, or dividend income and then promptly paid to departing participants for their shares, which are then reallocated to current participants. If the Plan has an accumulated balance of non-employer stock assets, those assets are not needed to be considered as part of the recycling process.

95. A sponsor company that desires all departing participant shares to be reallocated to current participants may also repurchase the shares using funds set aside by the company and then transfer the shares back to the ESOP as contributions or dividends.

96. Given that repurchases are a corporate liability, yet there are multiple options to have the ESOP retain and reallocate shares if desired, it is unnecessary and uncommon for a sponsor company to rely on the ESOP to fund repurchases solely or substantially from a long-term pool of assets held by the ESOP.

97. Repurchase studies are typically updated every year to account for any changes to projections.

98. A prudent ESOP fiduciary would evaluate the repurchase study or equivalent analysis to make careful and informed judgments concerning the reinvestment of cash earned by the ESOP. The ESOP fiduciary must compare the plan's asset schedule and income to the company's repurchase strategy to understand whether any cash on the plan's balance sheet is

transient cash intended for imminent share repurchases; whether any cash is part of the company's repurchase strategy but not expected to be used until a later date; and whether any cash is not expected to be used for repurchases at all. A prudent ESOP fiduciary also must ensure that the repurchase analysis was competently performed before relying on it.

99.    The actual amount of share repurchases transacted by the ESOP in any given year is not knowable to Plaintiff prior to discovery. The amount of share repurchases is not itemized in the Plan's annual reports to the DOL. Plaintiff did not receive that information from the Plan. Share repurchases are part of total distributions paid by the Plan—a sum that is reported annually to the DOL—but the reported sum of total distributions also includes the portion of departed participants' accounts that was always held in cash (*i.e.*, their OIA accounts). The split of participant distributions between share liquidations and accumulated OIA cash in any given year is known only to Defendants and their agents at this stage, and Plaintiff has no means of obtaining that information without discovery.

100.    Plaintiff also has no means of accessing any repurchase studies that were prepared or relied upon by Defendants in relation to the Plan. Any analysis, conclusions, and strategies with respect to repurchases that may have been formed or communicated between Norman S. Wright and the Committee Defendants are not knowable to Plaintiff until discovery. These records, and the degree of competence and diligence with which they were prepared and utilized, are likely to bear on whether Defendants knew or should have known that the Plan's accumulated dividends would not be expended on share repurchases in whole or substantial part for at least five years and would consequently lose buying power and the opportunity for capital appreciation unless prudently invested.

101.    Notwithstanding Plaintiff's lack of access to the precise repurchase amounts or any repurchase studies and related communications prior to discovery, the information available at this stage gives rise to the reasonable inference that Committee Defendants failed to engage in a prudent risk management process with respect to the Plan's accumulated profit distributions and possible share repurchases.

CLASS ACTION COMPLAINT

102.    The Plan's cash flows, allowing for reasonable estimates of share repurchases, show that the Plan has had the ability to fund repurchases entirely through new cash from profit distributions and other Plan income since its inception.

103.    This outcome was predictable to Defendants in 2021 and on an ongoing basis since 2021. The withdrawal terms of the Plan and earnings projections used by the Plan fiduciaries would have demonstrated to a prudent fiduciary that the Plan had far more accumulated earnings than it could spend on near-term repurchases. A prudent fiduciary would have known that the Plan was inviting near certain loss of buying power and loss of opportunity for capital appreciation by leaving all non-Norman S. Wright stock assets in cash during this period.

104.    While Plaintiff lacks the employee records and Plan transaction data necessary to estimate repurchases in advance or know the precise amounts transacted in the past, and must rely on reasonable estimates of past repurchase based on total distributions and the ratio of cash to Norman S. Wright stock in the Plan, the Defendants are able to estimate repurchase obligations 10 years in advance. This is because the withdrawal terms of the Plan call for a 5-year waiting period before the Company is obligated to repurchase shares from separated employees who have not yet reached normal retirement age, after which the separated employee is entitled to distribution of only 1/5 of their balance per year over the next 5 years. Defendants can estimate future repurchase amounts based on when participants left the company and the projected price of Norman S. Wright stock.

105.    Participants who are at or near retirement have additional liquidity options for their Norman S. Wright shares but repurchases from these participants are also predictable in advance to Defendants based on employee age and tenure. Only participants age 55 and older with 10 years of service are eligible for diversification of their ESOP accounts. A prudent review of Norman S. Wright's employee census data would have identified participant balances eligible for elective diversification each year in the future. Additionally, it is typical for fiduciaries to consider the expected rate at which eligible participants will request diversification based on past experience or industry averages, and the same should have been done by Defendants here.

CLASS ACTION COMPLAINT

106. Between the waiting period for separated employees and the age and tenure limits for additional liquidations of the ESOP's Company stock, the amount of repurchases transacted by the Plan each year since 2021 was foreseeable to Defendants in 2021 and on an ongoing basis since 2021.

107. New income to apply to repurchases was also predictable to Defendants. The company has consistently made large profit distributions to shareholders during the life of the Plan. The Plan paid off the promissory note used to acquire Norman S. Wright stock five years early in 2022 because Norman S. Wright paid profit distributions and contributions to the Plan in excess of the minimum amounts needed to fund the note payments and all other expenses of the Plan. After the note was paid off, Norman S. Wright continued to pay profit distributions to the Plan far in excess of the amounts needed to repurchase Company stock from terminated participants.

108. Given the Plan's excess cash balance as well as profit distributions and repurchases during the relevant time, a prudent fiduciary would have identified inflation risk and the risk of inadequate earnings to support their retirement goals to be the principal investment risks faced by Plan participants with respect to the cash accumulated in their accounts between 2021 and the present. For all the reasons discussed above, a prudent reinvestment strategy focused on investing in stocks through pooled investment funds should have been implemented for the Plan's excess cash in 2021 and maintained through the present. By failing to reinvest excess dividends and exposing Plan participants to loss of buying power and loss of opportunity for capital appreciation, Defendants violated ERISA's standard of prudence.

**D. Issues for Accounting**

109. According to the Company's filings with the California Secretary of State, an affirmative vote of 100% of the outstanding shares of Norman S. Wright's stock was needed in order to approve the company's conversion from an S corporation to a limited liability company in September 2024.

CLASS ACTION COMPLAINT

110.    On information and belief, Defendant Leao, acting as Trustee on behalf of the ESOP, voted in favor of the conversion and exchanging the ESOP's shares of company stock for LLC units or membership interest.

111.    As of the filing of this Complaint, Plaintiff has not received any information about the conversion transaction or an accounting of the conversion transaction.

112.    As of the filing of this Complaint, Defendant Norman S. Wright, in its capacity as the Plan Administrator, has not filed an auditor's opinion for the Plan's 2024 Form 5500 annual report, as required by ERISA. The Plan Administrator was obligated to file the auditor's opinion as part of the 2024 Form 5500 annual report no later than October 2025.

113.    Defendant Leao, acting for the Plan Administrator, filed an incomplete 2024 Form 5500 on October 15, 2025. The incomplete 2024 Form 5500 lists "Norman S. Wright Mechanical Equipment Corporation" as the Plan Sponsor. However, according to the California Secretary of State's records, Norman S. Wright Mechanical Equipment Corporation converted to an LLC in September 2024.

114.    The LLC conversion transaction is potentially detrimental to the ESOP and Plan participants. As the owner of S corporation shares, the ESOP was entitled to receive profit distributions *pro rata* with other shareholders in proportion to their ownership percentages.  The LLC units or membership interest received in exchange for the ESOP's shares are not subject to the same protections.

115.    In the conversion year of 2024, the ESOP received less than $2.1 million in profit distributions. In 2022 and 2023 when the ESOP owned S corporation shares for the full year, the ESOP received profit distributions of approximately $4.5 million and $4.3 million, respectively. On information and belief, the Company's performance did not decline in 2024, and the value of the Company's equity at year-end 2024 was the highest at any point since the inception of the ESOP.

116.    Under trust law principles as adopted and applied in ERISA cases, Plan participants are entitled to an adequate accounting of the conversion of the ESOP's shares to LLC units or membership interest and the profit distributions received since the conversion.

CLASS ACTION COMPLAINT

**PLAINTIFF'S LACK OF ACTUAL KNOWLEDGE**

117.    Until shortly before filing this action, Plaintiff lacked knowledge of material information to support these claims. Among other things, Plaintiff lacked knowledge of (1) the ESOP's net cash flows and accumulated cash balances, which is necessary to evaluate the time horizon and prudence of OIA investments; (2) the performance of other asset classes over relevant periods; and (3) the conduct of similarly situated ESOP fiduciaries who invest their plans' OIA funds in stocks and other asset classes. Plaintiff also lacked actual knowledge of Defendants' fiduciary process and had no means to access such information until discovery commences.

**PLAN-WIDE RELIEF**

118.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the ESOP to bring an action on behalf of the ESOP to obtain for the ESOP the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks recovery on behalf of the ESOP pursuant to this statutory provision.

119.    Plaintiff seeks recovery for injuries to the ESOP sustained as a result of fiduciary breaches and equitable relief on behalf of the ESOP as a whole pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2)-(3).

120.    Plaintiff is adequate to bring this action on behalf of the ESOP, and his interests are aligned with other participants and beneficiaries. Plaintiff does not have any conflicts of interest with any participants or beneficiaries that would impair or impede his ability to pursue this action. Plaintiff has retained counsel experienced in ERISA litigation and intends to pursue this action vigorously on behalf of the ESOP.

**CLASS ACTION ALLEGATIONS**

121.    Plaintiff additionally and alternatively seeks certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

122.    Plaintiff asserts these claims on behalf of a class of participants and beneficiaries of the ESOP (the "Class") defined as follows:

CLASS ACTION COMPLAINT

All vested participants and beneficiaries of the Norman S. Wright Mechanical Equipment Corporation Employee Stock Ownership Plan since February 2, 2021. Excluded from the Class are the individual Defendants and their immediate family members; any member of the Plan Committee or Trustee; the directors of Norman S. Wright Mechanical, or of any entity in which a Defendant has a controlling interest; and legal representatives, successors, heirs, and assigns of any such excluded person.

123.    <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The ESOP had several hundred vested participants during the relevant period.

124.    <u>Typicality</u>: Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff is an ESOP participant and suffered injuries as a result of Defendants' violations of ERISA. Defendants treated Plaintiff consistently with other Class members with regard to the ESOP. Defendants' improper actions affected all ESOP participants similarly.

125.    <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that he seeks to represent, and he has retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does not have any conflicts of interest with any Class members that would impair or impede his ability to represent such Class members.

126.    <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

a.  Whether Defendants were fiduciaries with respect to the ESOP and the scope of their fiduciary duties;

b.  Whether Defendants failed to comply with the ERISA fiduciary standards of prudence and loyalty in violation of 29 U.S.C. § 1104(a)(1);

c.  Whether Defendants invested ESOP assets for the benefit of the Company, a party in interest to the ESOP, in violation of 29 U.S.C. § 1106(a);

d.  The proper form of equitable and injunctive relief; and

e.  The proper measure of monetary relief.

26                    CLASS ACTION COMPLAINT

127. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

128. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

129. Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

130. In the alternative, Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature.

## **COUNT I**

### **29 U.S.C. § 1104(a)(1)**

### **Breach of Fiduciary Duty against Committee Defendants**

131. Plaintiff incorporates the foregoing paragraphs by reference.

132. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters

CLASS ACTION COMPLAINT

would use in the conduct of an enterprise of a like character and with like aims, and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with ERISA.

133.    Under ERISA § 404(a)(1)(A) and (B), a fiduciary with the authority to appoint and/or remove other fiduciaries has an obligation to undertake an appropriate investigation that the fiduciary is qualified to serve in the position as fiduciary and at reasonable intervals to ensure that the fiduciary who has been appointed remains qualified to act as fiduciary and is acting in compliance with the terms of the Plan and in accordance with ERISA.

134.    Under ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan" [] "if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary; or if by his failure to comply with his own fiduciary duties "he has enabled such other fiduciary to commit a breach, " or "if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

135.    Committee Defendants were fiduciaries with discretion concerning how the ESOP assets contained within the OIA are invested.

136.    Committee Defendants violated ERISA fiduciary standards set forth in 29 U.S.C. § 1104(a)(1) by failing to prudently invest the OIA in a manner consistent with the investment objectives of the ESOP and its participants.

137.    Specifically, Committee Defendants breached their fiduciary duties by:

a.  Investing substantially all OIA assets in cash and cash equivalents, which provide inadequate returns for long-term retirement savings;

b.  Failing to consider investing OIA investments across appropriate asset classes such as stocks and bonds;

c.  Failing to implement and follow a prudent investment policy for the OIA;

d.  Failing to monitor OIA investments and make changes as appropriate;

CLASS ACTION COMPLAINT

138.    Defendant Norman S. Wright violated ERISA fiduciary standards by failing to monitor the Committee members' and Trustee's management of the Plan and failing to ensure that the fiduciaries were investing the OIA with the care, skill, and diligence appropriate under the circumstances. Defendant Norman S. Wright further failed to mandate compliance or remove fiduciaries when the fiduciaries failed to abide by their fiduciary duties.

139.    Defendants' violations of 29 U.S.C. § 1104(a)(1) caused the ESOP injury in the form of lost investment earnings, and Defendants' deficient fiduciary conduct threatens future harm to the ESOP of the same character. These injuries to the ESOP adversely affected and continue to affect participants' ESOP accounts.

140.    Each Defendant is also liable for the fiduciary breaches of the other under 29 U.S.C. § 1105 as a co-fiduciary.

141.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiff, the ESOP, and the Class are entitled to recover losses caused by Defendants' violations of 29 U.S.C. § 1104(a)(1) and other equitable and injunctive relief.

## COUNT II

### 29 U.S.C. § 1106(b)

### Prohibited Transaction

### Against All Defendants

142.    Plaintiff incorporates the foregoing paragraphs by reference.

143.    Committee Defendants were ESOP fiduciaries with discretion concerning how the ESOP assets contained within the OIA are invested.

144.    Committee Defendants and Norman S. Wright violated 29 U.S.C. § 1106(b)(1) by using OIA funds in their own interest or for their own account.

145.    Committee Defendants stockpiled cash in the ESOP to have a ready source of funds available if they decide to sell their own Company stock.

146.    Norman S. Wright accumulated cash in the ESOP for the purpose of providing Norman S. Wright security concerning its financial obligations and share repurchase liability, rather than maximizing retirement benefits for participants.

147.    Defendants' violation of 29 U.S.C. § 1106(b) caused the ESOP injury in the form of lost investment earnings, and Defendants' deficient fiduciary conduct threatens future harm to the ESOP of the same character. These injuries to the ESOP adversely affected and continue to affect participants' ESOP accounts.

Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiff, the ESOP, and the Class are entitled to recover losses caused by Defendants' violation of 29 U.S.C. § 1106(b) and other equitable and injunctive relief.

### COUNT III

**29 U.S.C. § 1106(a)**

**Prohibited Transaction**

**Against All Defendants**

148.    Plaintiff incorporates the foregoing paragraphs by reference.

149.    Committee Defendants were ESOP fiduciaries with discretion concerning how the ESOP assets contained within the OIA are invested.

150.    Committee Defendants were ESOP fiduciaries with discretionary authority or discretionary control respecting management of the ESOP and exercised authority or control respecting management or disposition of the ESOP's assets, including its Norman S. Wright Company stock.

151.    The Defendant Company, Norman S. Wright, is a "party in interest" to the ESOP pursuant to 29 U.S.C. § 1002(14)(C) because its employees are the ESOP's participants.

152.    Each Committee Defendant is also a "party in interest" to the ESOP pursuant to 29 U.S.C. § 1002(14)(A) as a fiduciary of the ESOP.

153.    Committee Defendants violated 29 U.S.C. § 1106(a)(1)(D) by using the OIA funds for the benefit of Norman S. Wright by investing the OIA in cash equivalents. Upon information and belief, the Committee Defendants wanted to preserve the principal balance of the OIA for the purpose of relieving Norman S. Wright from its obligation to repurchase shares when employees request a distribution from the ESOP and/or to have ready cash available to purchase their equity interest in the Company at a later date.

CLASS ACTION COMPLAINT

154.    Committee Defendants violated 29 U.S.C. § 1106(a)(1)(D) by using ESOP's Company stock for their own benefit in the transaction whereby Norman S. Wright converted from an S Corporation to an LLC.

155.    Committee Defendants' violation of 29 U.S.C. § 1106(a) caused the ESOP injury in the form of lost investment earnings, and Committee Defendants' deficient fiduciary conduct threatens future harm to the ESOP of the same character. These injuries to the ESOP adversely affected and continue to affect Plaintiff's ESOP account.

156.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiff, the ESOP, and the Class are entitled to recover losses caused by Defendant's violation of 29 U.S.C. § 1106(a) and other equitable and injunctive relief.

### COUNT IV

### 29 U.S.C. § 1132(a)(2)-(3)

### Equitable Accounting against All Defendants

157.    Plaintiff incorporates the foregoing paragraphs by reference.

158.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), a Plan participant may obtain "appropriate relief" to violations of ERISA § 409, 29 U.S.C. § 1109, which establishes liability for fiduciary violations.

159.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), a Plan participant may obtain "appropriate equitable relief" to redress violations of ERISA or the Plan.

160.    Norman S. Wright, as Plan Administrator, is required to timely file a Form 5500 annual report with the Secretary of Labor pursuant to ERISA § 104(a), 29 U.S.C. § 1024(a).

161.    Pursuant to Department of Labor regulation requirements applicable to the Plan, the Form 5500 annual report must include an Auditor's opinion, financial statements, and notes to financial statements. 29 CFR § 2520.103-1. The notes to the financial statements must include , *inter alia*, "any significant changes in the plan made during the period and the impact of such changes on benefits … and any other matters necessary to fully and fairly present the financial condition of the plan." *Id*.

CLASS ACTION COMPLAINT

162.    Defendants violated ERISA and/or the terms of the Plan by failing to timely file an Accountant's Opinion with the Plan's 2024 Form 5500 annual report. Defendants further violated ERISA and/or the terms of the Plan by failing to inform Plan participants of the Company's conversion from an S Corporation to an LLC and the impact the conversion would have on the ESOP.

163.    ERISA allows equitable remedies available under the common law of trusts. *See CIGNA Corp. v. Amara*, 563 U.S. 421, 444 (2011).

164.    Under the common law of trusts, a beneficiary may compel a trustee to provide an accounting of actions taken with respect to the trust. *See* Restatement (Third) of Trusts § 83 cmt. b ("[A] beneficiary may compel the trustee to render an account of trust administration to the appropriate court.").

165.    Defendants must provide an accounting of the conversion of the ESOP's shares to LLC units or membership interest and subsequent profit distributions. This accounting shall include information necessary to understand how the conversion and exchange of shares was approved, whether subsequent profit distributions received by the ESOP were based on ownership percentages or something else, and whether the ESOP received protections in the transaction to compensate for the loss of S corporation shareholder rights.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment against Defendants and for the following relief:

    A.  Certify Plaintiff's authority to seek plan-wide relief on behalf of the ESOP pursuant to 29 U.S.C. § 1132(a)(2);

    B.  Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify Plaintiff as class representative, and certify undersigned counsel as class counsel;

    C.  Order Defendants to make good to the ESOP all losses resulting from their violations of ERISA;

CLASS ACTION COMPLAINT

D.  Impose equitable and injunctive relief sufficient to protect ESOP participants, including changes to Defendants' investment process and/or appointment of independent trustees, investment advisors and managers;

E.  Order an equitable accounting of the Company's profit distributions to the ESOP;

F.  Award Plaintiff reasonable attorneys' fees and costs incurred pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

G.  Award prejudgment and post-judgment interest; and

H.  Award such other and further relief as the Court deems just and equitable.

Dated: February 6, 2026                              Respectfully submitted,

                                                     FEINBERG, JACKSON,
                                                     WORTHMAN & WASOW, LLP

                                                     By: */s/ Dan Feinberg*
                                                         Dan Feinberg

                                                     ENGSTROM LEE LLC

                                                     By: */s/ Mark Thomson*
                                                         Mark Thomson (*pro hac vice*
                                                         to be filed)

                                                     *Attorneys for Plaintiff and the
                                                     Proposed Class*

CLASS ACTION COMPLAINT